UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

**TRUSTWORTHY LLC, d/b/a DAYS INN,**

           **Plaintiff,**

   v.                                             **8:16-CV-367 (NAM/DJS)**

**VERMONT MUTUAL INSURANCE GROUP,**

           **Defendant.**
_____

**APPEARANCES:**

Jennifer M. Van Voorhis, Esq.
Merlin Law Group, P.A.
125 Half Mile Road, Suite 200
Red Bank, NJ 07701
*Attorneys for Plaintiff*

Daniel W. Coffey, Esq.
Bowitch & Coffey, LLC
17 Elk Street
Albany, New York 12207
*Attorneys for Defendant*

**Hon. Norman A. Mordue, Senior U.S. District Court Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.    INTRODUCTION**

      Plaintiff Trustworthy LLC, the owner of the Days Inn Hotel in Plattsburgh, New York, brings this diversity action against its insurance carrier Defendant Vermont Mutual Insurance Group, alleging a single cause of action for breach of contract related to benefits allegedly owed under an insurance policy. (Dkt. No. 14). Plaintiff originally filed suit in Supreme Court, Clinton County, New York, and Defendant then removed the

1

action to this Court. (Dkt. No. 1). Now pending before the Court is Defendant's motion for summary judgment. (Dkt. No. 33). Plaintiff has opposed the motion. (Dkt. No. 36). For the reasons set forth below, Defendant's motion is granted.

## II. BACKGROUND[1]

### A. Plaintiff's Hotel

Plaintiff Trustworthy LLC is the owner of the Days Inn hotel located at 8 Everleth Drive in Plattsburgh, a property it purchased in 2009. (Dkt. No. 33-1, ¶¶ 21, 29). The hotel was built in 1983; it is three stories high, and in 2014, it had 106 rooms. (*Id.*, ¶¶ 37, 42). Bhavik Jariwala is a salaried employee of Trustworthy LLC, whose role is "overlooking operations and asset management for the Plattsburgh Days Inn," including submission of insurance claims. (*Id.*, ¶¶ 30–31). Mr. Jariwala's parents are "50-50 members of Trustworthy LLC." (*Id.*, ¶ 29). In 2014, Jackie Wells was the general manager of the hotel, who reported to Mr. Jariwala. (*Id.*, ¶¶ 30, 38). In 2014, Christopher Carron was the maintenance supervisor at the hotel, a position he held before Plaintiff purchased the property in 2009. (*Id.*, ¶ 39).

When Plaintiff purchased the hotel in 2009, the original roof had been in place since the hotel was built in 1983. (Dkt. No. 33-1, ¶¶ 21, 85). Mr. Carron described it as a "flat rubber roof." (Dkt. No. 33-12, p. 17). Certain maintenance repairs had been

---

[1] The facts are drawn from the undisputed facts in Defendant's Statement of Material Facts, Dkt. No. 33-1; Plaintiff's Response, Dkt. No. 36-1; and the exhibits submitted in connection with Defendant's motion, including the complete, certified copy of the Policy at issue in this case, Dkt. No. 33-17. Where the facts stated by the parties are supported by testimonial or documentary evidence, and denied with only a conclusory statement, the Court has found such facts to be true. *See* Local Rule 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."); *J & J Sports Prods., Inc. v. Mari*, No. 10-CV-455(DLI)(JMA), 2012 WL 1004842, at *2, 2012 U.S. Dist. LEXIS 40284, at *4 (E.D.N.Y. Mar. 23, 2012) ("The Court will not permit [the defendant] to create a genuine issue of material fact where the unsubstantiated facts asserted contradict those supported by plaintiff's admissible evidence.").

performed on the roof over the years. (Dkt. No. 33-1, ¶ 22). Mr. Carron testified that he made repairs due to wear and tear on the roof. (Dkt. No. 33-12, pp. 14, 32). Every year there were problems with the roof leaking due to the weight of snow and slush on the rubber and the rubber shrinking. (*Id.*, pp. 22, 78). Mr. Carron said that he had to go onto the roof in the springtime to make repairs because "it's an ongoing maintenance issue." (*Id.*, pp. 38–39). In 2011, a company called Monahan Brothers also did work on the roof, "adding rubber where it had pulled out." (Dkt. No. 33-1, ¶ 65).

### B. The Insurance Policy

Plaintiff obtained insurance for the hotel in 2009, through a Business Owners Policy, number BP21029760 (the "Policy"), issued by Northern Security Insurance Company, Inc. (*See* Dkt. No. 33-17). Defendant has been the insurance carrier for Plaintiff since that time. (Dkt. No. 33-1, ¶ 34). The Policy covered the hotel building and was renewed to cover the period between October 29, 2013 and October 29, 2014. (Dkt. No 33-17, pp. 3, 11). In a section entitled "Duties in the Event of Loss or Damage," the Policy states the following:

> You must see that the following are done in the event of loss or damage to Covered Property:
>
> (1) Notify the police if a law may have been broken.
> (2) Give us prompt notice of the loss or damage. Include a description of the property involved.
> (3) As soon as possible, give us a description of how, when and where the loss or damage occurred.
> (4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

3

> (5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.
> (6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records. Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.
> (7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.
> (8) Cooperate with us in the investigation or settlement of the claim.
> (9) Resume all or part of your "operations" as quickly as possible.

(*Id.*, p. 24). The Policy covered various Causes of Loss, but had certain exclusions, including for "Wear and tear." (*Id.*, p. 21).

### C.  Plaintiff's Insurance Claim

On September 11, 2014, Plaintiff submitted a Property Loss Notice to Defendant, which described the loss and damage as follows: "Wind driven rain – damage to hotel rooms and hallway damage/ceiling, floor." (Dkt. No. 33-10). The date of loss was noted as May 16, 2014. (*Id.*). According to Mr. Jariwala, he first became aware of "water problems" at the hotel in the summer of 2014. (Dkt. No. 33-11, p. 31). He testified that during the summer, there were "more water marks" on the ceiling in the hotel and "more intense smell of mold." (*Id.*, pp. 32–34). Mr. Jariwala testified that he could not recall noticing anything significant on May 16, 2014, but that "I think from our records that was when the first appearance of a water mark may have appeared." (*Id.*, pp. 34, 38). Mr. Carron testified that in 2014 he was aware of problems with the roof as early as March, and that he performed repairs that spring, from March until May. (Dkt. No. 33-12, pp. 46–47). In an affidavit, he described finding leaks in the ceiling on the third floor of the hotel and patching the rubber on the roof. (Dkt. No. 33-13). Mr. Carron testified that the

4

leaky roof was an "ongoing situation," and that he did not know why May 16, 2014 was the precise date of loss for Plaintiff's insurance claim. (Dkt. No. 33-12, pp. 61–62).

Mr. Jariwala also testified that "summertime is our peak season at all of our hotels so it is a really busy time for me and on top of that I was planning this wedding of mine." (Dkt. No. 33-11, p. 97). Mr. Jariwala testified that towards the end of August 2014, Plaintiff retained The Insurance Doctor as its public adjuster. (*Id.*, p. 35). Mr. Jariwala told the public adjuster about "the type of issues we were having with the water damage getting worse and the smell of mold getting worse." (*Id.*).

After Plaintiff filed the claim on September 11, 2014, claims adjuster Nicole Hilliker was assigned to investigate. (Dkt. No. 33-2, ¶¶ 1, 6, 10). According to Ms. Hilliker, she "immediately contacted the insured's public adjuster, The Insurance Doctor, and they mutually agreed to inspect the hotel on September 22, 2014, then rescheduled at The Insurance Doctor's request for October 6, 2014." (*Id.*, ¶¶ 12–14).

Before the inspection date, Plaintiff retained CPR Restoration and Cleaning Services LLC ("CPR") to perform repairs at the hotel on September 16–19, 2014. (*See* Dkt. No. 33-1, ¶ 59; Dkt. No. 33-22). Mr. Jariwala testified that CPR was brought in at the recommendation of The Insurance Doctor. (Dkt. No. 33-11, pp. 44–45). Mr. Jariwala believed that CPR worked on the hotel before Defendant had the chance to inspect it in October. (*Id.*, pp. 101–02). CPR removed carpet, cut out sections of sheetrock where it could not be dried, and cut out material from the ceilings and walls. (Dkt. No. 33-1, ¶ 56).

According to Ms. Hilliker, when she inspected the hotel on October 6, 2014 and "walked through the hotel rooms that were supposedly damaged the prior May by water

5

infiltration, [she] noticed that portions of walls had already been removed, ceiling tiles had already been replaced, wall paper had already been repaired, walls had been removed, portions of carpet had already been removed, and some stains on the ceiling had already been painted over." (Dkt. No. 33-2, ¶ 18). She also inspected the roof the same day and noticed that "the roof had already been repaired along the perimeter parapet wall with new flashing," and that "[t]here were a few areas where the roof was pulled down along the parapet wall, but most of the areas of the roof appeared to have already been repaired prior to my arrival." (*Id.*, ¶ 19). Ms. Hilliker states that she found out that CPR made "substantial changes to the hotel rooms that were alleged to have suffered water damage, by ripping out sheetrock, removing carpet, walls and ceiling." (*Id.*, ¶ 15).

Ms. Hilliker further states that:

[A]t my inspection on October 6, 2014, I saw only very minor damage on the roof as the roof had obviously been repaired prior to my arrival. I was not able to ascertain whether or not the roof had ever been damaged by wind-driven rain or any other cause. It was impossible for me to make a determination of what had caused damage to the roof and purported water infiltration, because the roof had been repaired prior to my arrival.

(*Id.*, ¶ 20). Ms. Hilliker also took numerous pictures of the roof, noting "repairs made prior to our inspection." (*See, e.g.*, Dkt. No. 33-21, pp. 56–69).

On October 7, 2014, Ms. Hilliker emailed Jack Winter from The Insurance Doctor requesting further information in order to evaluate the claim, including:

[P]hotographs showing any damage, including the roof, prior to any repairs being made, moisture mapping information from CPR, invoices for the repairs CPR and anyone else had already made, a statement from whoever did work on the roof regarding damages that were found prior to repairs being made, estimate of repairs, a timeline of events/additional information from the insured regarding when the roof damage and interior water damage were discovered, and maps of floors 1–3 showing room layouts.

6

(Dkt. No. 33-2, ¶ 31). Mr. Winter responded that he would forward "the receipts for work done at the hotel prior to and following the loss date of May 16, 2014," and he also offered his "theory on the Cause of Loss and the dates of occurrence," writing as follows:

> The proximate cause of loss is the Weight of Ice & Snow on the flat roof system at the hotel. Due to the severity of last winter, the snow and ice remained on the roof in that state until the spring thaw, which was in late April or early May. The date of May 16, 2014 is the date of discovery of the majority of the interior water damages. Prior to that date, there may have been minimal water penetration, but to no great extent. It was not until a warming event (sunshine and rising temperatures) caused a thaw and subsequent influx of water into the 3rd floor and down to the two floors below.

(Dkt. No. 33-19). Mr. Winter also wrote that "[t]he reason for late reporting was that Mr. Jariwala was trying to locate a company to represent his interests following discussions with his agent," and that once The Insurance Doctor got involved, "the claim was reported immediately and we made ourselves available to perform an inspection." (*Id.*). Further, Mr. Winter wrote that "[w]e called CPR in to cut out the soggy drywall, which had not dried as of the initial date of water infiltration." (*Id.*).

On October 22, 2014, Ms. Hilliker sent The Insurance Doctor a letter requesting additional documentation to evaluate the claim, including "any and all documentation that you, the insured and any contractors/vendors may have to show the damage to the roof and interior prior to making repairs and completing the dry out." (Dkt. No. 33-20). On December 17, 2014, a second request was made. (Dkt. No. 33-25). On December 22, 2014, Mr. Winter responded in relevant part as follows:

> I was told by CPR Restoration that you told them that you were waiting for me to send you photographs of the roof . . . with snow on it. I was unaware that you wanted photos from me showing the roof in this condition, because I do not have any. We became involved with this claim after the snow that caused the damages was melted and gone. The Emergency Repairs on the roof was done by the Maintenance people at the

7

> hotel, however I do have a condition report and an estimate prepared by CentiMark Roofing.

(Dkt. No. 33-26). Mr. Jariwala was not aware of what information was turned over to Defendant by The Insurance Doctor. (Dkt. No. 33-11, pp. 113–15). The Insurance Doctor ultimately produced to Defendant a report prepared by a company called CentiMark, which stated that the roof was at the "end of its life cycle" and needed to be replaced. (Dkt. No. 33-1, ¶ 122; Dkt. No. 33-27). The report contained pictures of the roof taken in 2011, before the repairs by the Monahan Brothers. (Dkt. No. 33-1, ¶ 99). According to Ms. Hilliker, "[t]his report clearly states the entire roof was old and needed to be entirely replaced," and "[t]here is no indication in this report to support a claim that the roof had been damaged by weight of snow and ice during the prior winter." (Dkt. No. 33-2, ¶ 32).

Further, Ms. Hilliker avers that "[b]ecause VMI was not able to verify the cause of loss, because of the delay in reporting the claim to us, and because the rooms had been torn up and the roof repaired prior to VMI being able to inspect them, VMI made a decision to deny the claim." (*Id.*, ¶ 34). On April 7, 2015, Defendant sent a letter denying Plaintiff's claim, explaining that:

> The reason your claim is being declined is because of your failure give us prompt notice of the loss and to exhibit the damaged property. These failures have prejudiced the rights of our company. Our rights became prejudiced because your failure to promptly report the loss and exhibit the damaged property prevented us from independently verifying the cause of loss and the extent of the necessary repairs.

(Dkt. No. 33-29, p. 3). Later in 2015, Plaintiff paid CentiMark to do additional repairs on the roof and it has not leaked since. (Dkt. No. 33-1, ¶ 102; Dkt. No. 33-11, pp. 73, 129).

### III.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim") (internal quotation marks omitted).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw

9

all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

## IV. DISCUSSION

Plaintiff's breach of contract claim alleges that Defendant failed to pay out for Plaintiff's insurance claim under the Policy. (Dkt. No. 14). But Defendant seeks summary judgment on the basis that Plaintiff failed to perform its duties under the Policy. (Dkt. No. 33-31). The elements of a breach of contract claim under New York law[2] are: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996). Defendant argues that Plaintiff's insurance claim was properly denied based on Plaintiff's failure to satisfy two provisions of the Policy:

---

[2] Both parties rely on New York law in their memoranda of law in this case. (*See, e.g.*, Dkt. No. 33-1, p. 10; Dkt. No. 36, p. 3). Moreover, "a contract executed in New York and litigated in a district court sitting in New York while exercising diversity jurisdiction must be interpreted pursuant to New York law." *82-11 Queens Blvd. Realty, Corp. v. Sunoco, Inc. (R & M)*, 951 F. Supp. 2d 376, 381 (E.D.N.Y. 2013). The Court will thus apply New York law. *See Pearson v. Walden Univ.*, No. 13 Civ. 7840, 2015 WL 6619981, at *4, 2015 U.S. Dist. LEXIS 147641, at *10-11 (S.D.N.Y. Oct. 30, 2015) (citing cases).

10

1) "Plaintiff failed to provide VMI with 'prompt notice' 'as soon as possible' regarding this roof/water claim," and 2) "Plaintiff did not afford VMI an opportunity to view the allegedly damaged roof and rooms prior to repairs having been made, thus making it impossible for VMI to make a determination as to whether or not the roof was damaged by a covered event."  (Dkt. No. 33-31, p. 4).

### A. Notice Provision

First, Defendant argues that Plaintiff's breach of contract claim must fail because Plaintiff did not provide timely notice under the Policy.  (Dkt. No. 33-31, p. 10). According to the Policy, in the event of loss or damage, Plaintiff was required to give "prompt notice of the loss or damage," and "as soon as possible," provide a description of "how, when and where the loss or damage occurred."  (Dkt. No. 33-17, p. 24).  Here, it is undisputed that Plaintiff gave notice on September 11, 2014, when its public adjuster submitted a Property Loss Notice to Defendant, which described "damage to hotel rooms and hallway damage/ceiling, floor" due to "wind driven rain."  (Dkt. No. 33-10).  The date of loss was reported as May 16, 2014.  (*Id.*).  Thus, Defendant argues that "it is undisputed that at the very least, Plaintiff failed to provide notice of a claim to VMI until nearly four months after the loss was first discovered."  (Dkt. No. 33-31, p. 12).

It is well-settled that when an insurance policy requires that notice of an occurrence or claim be given "promptly" or "as soon as possible," the "notice must be given within a reasonable time in view of all of the facts and circumstances." *Cambridge Realty Co., LLC v. St. Paul Fire & Marine Ins. Co.*, 421 F. App'x 52, 56 (2d Cir. 2011) (citing cases).  "Where there is no excuse or mitigating factor, relatively short time periods of delay are deemed unreasonable as a matter of law." *Id.*  "The absence of

11

timely notice of an occurrence is a failure to comply with a condition precedent which, as a matter of law, vitiates the contract." *Argo Corp. v. Greater New York Mut. Ins. Co.*, 827 N.E.2d 762, 764 (2005). Among other things, the requirement for timely notice "protects the carrier against fraud or collusion" and "gives the carrier an opportunity to investigate claims while evidence is fresh." *Id.*

In opposition to Defendant's motion, Plaintiff now contends that "[t]he damage was discovered at the end of August," and Plaintiff waited only "two to three weeks" to report it to Defendant on September 11, 2014. (Dkt. No. 36, pp. 8–9). However, Plaintiff does not cite any evidence to support this new theory, which flies in the face of the undisputed facts. Again, Plaintiff's own insurance paperwork gave May 16, 2014 as the date of loss. (Dkt. No. 33-10). Plaintiff's public adjuster wrote to the claims adjuster that "[due to the severity of last winter, the snow and ice remained on the roof in that state until the spring thaw, which was in late April or early May," and "[t]he date of May 16, 2014 is the date of discovery of the majority of the interior water damages." (Dkt. No. 33-19). Mr. Jariwala testified that he thought May 16, 2014 "was when the first appearance of a water mark may have appeared." (Dkt. No. 33-11, p. 38). Mr. Carron said that water problems often appeared after the snow melted or a heavy rain, and that during the spring of 2014, he noticed leaks in the hotel ceiling and did repairs on the roof. (Dkt. No. 33-12, pp. 38–39; Dkt. No. 33-13). This is all consistent with Plaintiff's allegation that "[o]n or about May 16, 2014, damage to the Property's interior was discovered as a result of water infiltration from roof damage from Ice Damming, Heavy Snow Accumulation, and high winds," (Dkt. No. 14, ¶ 3), a date which Plaintiff repeated in its sworn interrogatory responses. (Dkt. No. 33-9, p. 5).

12

Thus, although Plaintiff argues that the "date of loss is a material fact in issue," Plaintiff cannot create an issue of fact out of thin air, which contradicts its own evidence.[3] *See Crawford v. Franklin Credit Mgt. Corp.*, 758 F.3d 473, 482 (2d Cir. 2014); *Lipton v. Nat. Co.*, 71 F.3d 464, 469 (2d Cir. 1995) ("mere conclusory allegations or denials in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist") (internal quotations and citation omitted); *see also Pub. Warehouses of Matanzas v. Fid. & Deposit Co. of Maryland*, 77 F.2d 831, 832 (2d Cir. 1935) ("The court below erroneously permitted the jury to determine the time the loss was discovered for there was no question of fact as to the date of discovery. It was an admitted fact in the complaint filed.").

Starting from May 16, 2014, a total of 118 days elapsed before Plaintiff filed its claim on September 11, 2014. Plaintiff's public adjuster wrote that "[t]he reason for late reporting was that Mr. Jariwala was trying to locate a company to represent his interests following discussions with his agent." (Dkt. No. 33-19). Mr. Jariwala testified that it was "a really busy time for me and on top of that I was planning this wedding of mine." (Dkt. No. 33-11, p. 97). However, these are not the sort of excuse, "such as lack of knowledge that an accident occurred, that will explain or excuse delay in giving notice

---

[3] Although Defendant points out that some evidence indicates that Plaintiff had notice of any damages even earlier in the spring of 2014, the Court need not address this argument since the undisputed facts show that Plaintiff had notice of the damages to the hotel by May 16, 2014 at the latest, and using that date, Plaintiff failed to submit a timely notice to Defendant. In addition, while Plaintiff cites no evidence to support a later discovery date, the Court notes that Mr. Jariwala testified that the damage "appeared worse" towards the "end of the summer." (Dkt. No. 33-11, p. 44). Nevertheless, the undisputed facts show that by May 16, 2014, Plaintiff was required to give notice because "the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim." *Sparacino v. Pawtucket Mut. Ins. Co.*, 50 F.3d 141, 143 (2d Cir. 1995) (citing cases); *see also Power Auth. v. Westinghouse Elec. Corp.*, 502 N.Y.S.2d 420, 422 (N.Y. App. Div. 1st Dept. 1986) ("When the insured indefinitely reserves to itself the determination of whether a particular loss falls within the scope of coverage it does so at its own risk.").

13

and show it to be reasonable." *Sec. Mut. Ins. Co. of New York v. Acker-Fitzsimons Corp.*, 293 N.E.2d 76, 78 (1972). Moreover, there is no evidence that Plaintiff made any effort whatsoever concerning a potential claim until the end of August 2014, when Plaintiff retained The Insurance Doctor as its public adjuster. (Dkt. No. 33-11, p. 35). *See* 31 N.Y. PRAC., NEW YORK INSURANCE LAW § 30:31 (2017-2018 ed.) ("A significant factor in determining whether the insured's delay was reasonable under the circumstances was whether the insured acted with due diligence in determining the nature of the injury, claim, or other loss.").

Accordingly, in view of all the undisputed facts and circumstances, the Court concludes that Plaintiff failed to provide timely notice because it waited nearly four months to report a loss to Defendant after discovering damage to the hotel, without any tenable excuse for the delay. Therefore, Plaintiff's breach of contract claim must fail and Defendant is entitled to summary judgment.[4] *See Indian Harbor Ins. Co. v. City of San Diego*, 586 F. App'x 726, 729 (2d Cir. 2014) ("Under New York law, delays of one or two months are routinely held unreasonable.") (citing cases); *Cambridge Realty Co., LLC v. St. Paul Fire & Marine Ins. Co.*, 421 F. App'x 52, 57 (2d Cir. 2011) ("We agree with the district court that a delay of over three months between plaintiffs' recognition of

---

[4] The Court notes that Defendant need not show prejudice to deny coverage on the basis of untimely notice. *See* N.Y. Ins. Law § 3420; *Provencal, LLC v. Tower Ins. Co. of New York*, 30 N.Y.S.3d 138, 140 (N.Y. App. Div. 2d Dept. 2016) ("Where, as here, the underlying insurance claim does not arise out of an accident involving bodily injury or death, Insurance Law § 3420 and its heightened requirements do not apply."). Nonetheless, Defendant points out that "since the roof had already been repaired by the time VMI finally (after Plaintiffs public adjuster canceled the previously-scheduled date for the inspection) inspected the loss on October 6, 2014, the delay in reporting the loss, coupled with Mr. Carron having already repaired the roof prior to VMI's arrival, coupled by CPR Restoration ripping out carpet, ceilings and sheetrock in supposedly water damaged rooms prior to VMI's inspection, all created a situation where it was impossible for VMI to evaluate the claim, the extent of the damage and the cause of the loss." (Dkt. No. 33-31, p. 13).

14

possible liability and St. Paul's receipt of notice was unreasonable under the circumstances."); *Zadrima v. PSM Ins. Companies*, 616 N.Y.S.2d 817, 818 (N.Y. App. Div. 2d Dept. 1994) (finding that the plaintiffs failed to provide "prompt notice" where they had "contemporaneous knowledge of the occurrence, yet provided no notice thereof to the insurer until approximately four months later," and "provided no reasonable explanation for this omission"); *see also* 31 N.Y. PRAC., NEW YORK INSURANCE LAW § 30:31 (2017-2018 ed.) ("Absent other mitigating circumstances, delays of several months or more are generally deemed unreasonable as a matter of law.").

### B. Inspection Provision

Defendant also argues that Plaintiff's breach of contract claim must fail because Plaintiff failed to satisfy its obligation under the Policy to provide Defendant with an "opportunity to view the claimed damaged roof." (Dkt. No. 33-31, pp. 14-16). However, the Court need not consider this argument, since Plaintiff failed to provide timely notice, as discussed above. *See Argo Corp.*, 827 N.E.2d at 764 ("The absence of timely notice of an occurrence is a failure to comply with a condition precedent which, as a matter of law, vitiates the contract." ); *Rael Automatic Sprinkler Co., Inc. v. Schaefer Agency*, 821 N.Y.S.2d 118, 119 (N.Y. App. Div. 2d Dept. 2006) ("Compliance with an insurance policy notice provision is a condition precedent to coverage, and the failure to comply vitiates the policy."); *see also Ticheli v. Travelers Ins. Co.*, No. 14 Civ. 172, 2015 WL 12734163, at *8; 2015 U.S. Dist. LEXIS 192141, at *22 (N.D.N.Y. Mar. 14, 2015) ("Because the Court has already determined that Plaintiff's claim against the Policy is barred and that summary judgment must be granted to Defendant, there is no basis for the Court to examine Defendant's other alternative grounds for summary judgment.").

## V. CONCLUSION

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 33) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's breach of contract claim against Defendant is **DISMISSED with prejudice**; and it is further

**ORDERED** that the Amended Complaint (Dkt. No. 14) is **DISMISSED with prejudice**.

**IT IS SO ORDERED**.

Date:  March 15, 2018
       Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge